# Walden v. Commonwealth.

June 2, 1939.

J. M. Wolfinbarger and Ezart Ashcraft for appellant.

Hubert Meredith, Attorney General, and Wm. F. Neill, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Reversing.

Appellant, together with Taylor Sparks and Rosa Woolery, was indicted on a charge of murdering Dave Woolery, Rosa's husband, in furtherance of a conspiracy to commit the crime. Upon the calling of the case (we gather from brief rather than the record that Sparks had been killed after the indictment and prior to the trial) there was a motion for severance and the commonwealth elected to place appellant on trial.

The result of the trial was a verdict of guilty, the jury inflicting the life penalty. Motion for a new trial was overruled; judgment entered in accord with the verdict, appellant insisting on appeal that he was entitled to a directed verdict of not guilty, at the close of the evidence. Other grounds were set up in the motion, but after review of the evidence we have concluded that there is no necessity of discussing any other than the one stated.

We do not gather from the record, but do from appellant's brief, that the alleged murder was committed in 1930, and the indictment was not returned until 1938. At this point we take occasion to say, lest it be overlooked, that the map or drawing prepared and introduced by the one party or the other loses all its effect here, because witnesses who testified to material and important facts merely referred to "here" and "there" without indicating by appropriate marks the various points. In this case particularly the failure to do so necessarily renders the testimony confusing and results

in no sort of help to the court, except in relation to identified buildings, road and creeks. Why this is so frequently the case we cannot conceive, but it is nevertheless of continual recurrence.

Woolery was found dead, hanging by a trace chain out of the loft window of the barn of a neighbor, for whom he had been working for some time. As near as we can gather from an incomplete history, the discovery was on a Sunday morning about 7:30, in the month of March. The weather was cold and rainy, with a slight snow on the preceding Saturday night.

One of his neighbors discovered his body. A trace chain had been cut from a set of harness owned by Mr. Garrett, and in place in the lower part of the barn. It had been looped around Woolery's neck and the "hook" fastened to a beam just inside the window. Garrett helped to take Woolery's body down. He said that there was mud on the back of his hands, clay mud, and some black mud on the inside of his hands, but no mud on the chain, nor any on a knife which was found in Woolery's pocket. There was little or no mud on his shoes. Two of his finger nails were "busted back." The harness, according to Garrett, had been last used by Woolery in hauling some corn to Taylor Sparks, perhaps a week before the finding of the body.

Garrett testified that he later missed another trace chain, which had been taken from his woodshed and which he had never seen afterward. Some one had told him that Tom Tuttle had found one in his car about a week later. Tuttle says he did find a trace chain, but there is a complete failure to connect the one found with the one lost.

Mr. Garrett, and several other witnesses, testified to seeing tracks around the barn, and from a point in the road leading from the barn. They describe them as looking like a couple walking two or three feet apart and one behind, "and it appeared that they would go deep in the mud, and they came up on the fill and came up on top, and as they went down on the other side to the gate where it went into the barn, it was muddy there; the stock had been in there, and I went in below the house and found in the bottom where it was torn up (other witnesses say padded down) a piece of a woman's cloak, and I saw a bottle there; picked it up and smelled of it and took it to the house; and in a few minutes Bob

Woolery came and got it and said it was chloroform."
Here Garrett said, "We tracked them from right there
to the barn." At this point Garrett said they found
indications of a struggle. It was afterwards testified
that the piece of cloth "looked like a piece from a cloak
that Rosa Woolery owned and wore."

The weakness of the effect of this testimony as to
the piece of cloth, appearing to be from a cloak worn by
Rosa, is shown by the testimony of the star witness, the
Lunsford girl, who positively testified that Rosa was
not out of the Woolery home after Dave Woolery left
about 11:30. It could have been found at or near the
described spot, and accounted for, as will be shown
later.

The testimony given up to this point is corrobo-
rated by several witnesses who were at the scene at a
time not particularly disclosed, but as we read the evi-
dence at such a time as not to lend any great weight to
the matter of "tracks of two or three persons, walking
two or three feet apart, with a third track, which looked
like a track made by a woman's shoe, trailing behind."
The "woman's shoe" seems to be eliminated by the
star witness' testimony, that after Woolery suddenly
left home Saturday night, she and Rosa sat up until
the next morning.

At this point it may be well to recite evidence re-
lied upon by the commonwealth, in an effort to show
that appellant Sparks and Rosa conspired to take the
life of Woolery. The Lunsford (or Hunt) woman is
the only one who undertook to testify on this point.

At the time of Woolery's death she lived in Lexing-
ton, but was visiting her father in the general neighbor-
hood of the Woolerys, Garretts, and others who testified
for the commonwealth. She was then about sixteen or
seventeen years of age, and was on friendly terms with
appellant, and Rosa Woolery was friendly with Taylor
Sparks. On the day previous to the day Woolery was
found dead, she was at the Woolery home, where she
says she went shortly after dark and no one was at
home but Dave, Rosa and their little girl; that no one
came there after she got there. She was, perhaps, mis-
taken on this point if other testimony, both of common-
wealth and defense, is to be believed.

About 7:30 or 8 o'clock she and Rosa left the Wool-
ery home and started toward Irvine, a few miles distant.

Whether they were riding or walking is not disclosed. At a short distance from the home they met Sparks and Walden coming from Irvine, Sparks driving a coupe. Some invitational words were passed and Sparks turned around and the two women got in the car, and the four went back to Irvine, then past Ravenna, where appellant and Bertha Lunsford walked up the road some distance and remained there for a short while (appellant says twenty or thirty minutes) and then returned to the coupe. The party then drove to Irvine; walked or "fooled" around town for a while, and then started home. There had been a rain that night, and as they approached a creek on their way home they found it had risen to such an extent that Sparks thought it would be unsafe to attempt a crossing. They remained in the car for a time, or until the water had subsided, and proceeded homeward.

Bertha says that while they were waiting, "Ira Garrett's wife came up the creek and Taylor Sparks said, 'I'll kill that s. o. b. right now.' " Who Ira Garrett's wife was, or what connection she had with the entire transaction is not shown. This is the only time the name is mentioned in the record.

The party drove to a point in front of and below Woolery's home, arriving there, as Bertha says, at 11 or 11:30. She then relates:

"We got out of the car and Taylor Sparks gave Rosa his gun and said 'if everything is all right you come to the back door and strike some matches,' and we went to the kitchen door and opened it and struck some matches."

On cross-examination, in answer to this question:

"What did they want her to strike matches for?" she replied, "Taylor said if everything was all right and no argument to come to the back door and he whispered and give her the gun. As soon as we struck the matches Taylor turned on the lights and started the motor."

As will appear later, this was a peculiar action if Sparks and Walden were waiting, as is claimed, for Rosa to drive her husband into the hands of appellant and Sparks. Witness says Sparks' car was headed up the creek towards Sparks' and appellant's homes.

After Rosa and Bertha got back into the house,

Bertha says, "I don't know what happened," and in the next breath, "Dave jumped on Rosa and wanted to raise an argument, and she grabbed the gun and said, 'I will kill you, you s. o. b.' Dave he run through down the field—there's a creek on one side and a road on the other side—and he run down there. She shot the pistol in the ground beside the porch three times and screamed like a wild cat." Witness and Rosa then sat up the rest of the night, and the next morning some neighbors came by and told them that Dave was dead. Rosa fainted and witness "took cold water and brought her to."

At this point it may be well to state the theory upon which the prosecution of appellant was predicated. It was the endeavor of the commonwealth to show that either Rosa or Sparks, or perhaps both, had a desire to get rid of Rosa's husband. The only evidence of such a plan is that given by Bertha Lunsford, by all the evidence shown to have been friendly with Walden, who, as we view the proof, was not shown to have any sort of motive, purpose or reason to rid himself of Woolery.

Insofar as Walden is or was concerned, there is a total lack of evidence which would fasten a charge of conspiracy upon him. If he conspired, it must be based on the ground solely that he wanted to accommodate Rosa or Sparks, or both, in getting Woolery out of the way.

The plan, as theorized by the commonwealth, was for Rosa to drive Dave out of the house into the hands of appellant and Sparks, there chloroform Dave and then along with Rosa proceed to Garrett's barn, obtain a trace chain, take him up into the loft and swing him out of the window by his neck. This is difficult for us to assimilate, when we can see how the result could have been reached in a less bizarre fashion. Dave was at home, and the four who were then on intimate terms of friendship, could have walked in on Woolery, and in some less unusual manner have ended his life, with little difficulty of presenting a fair case of self-defense. However, there is already too much speculation in the case.

A number of witnesses were introduced to show (and they thus testified) that around the place where it appeared an automobile had stood there were numerous tracks; that at another point there appeared evidence of struggle. The tracks were followed and led to and

through the barn lot to the barn. The tracks, after they left the scene of the suggested struggle, proceeding to the barn, showed, as the witnesses say: "two walked in front, and the third followed at a short distance, and the indications were that the three persons who were making the tracks were carrying a heavy load." To say the least of this evidence, it was a remarkable bit of detective work. It was also said that the rear tracks had the appearance of having been made by a woman's shoe and that a piece of Rosa's cloak was found near the place, yet the star witness says that Rosa did not leave the house after firing the shots into the ground. If a part of Rosa's garment was found, it might have been accounted for by the fact that she, according to all the proof, got out of the car near, and walked to, her home.

A bottle was found by some of the witnesses, said to have been empty; by some said to contain a small quantity of liquid; some describing the liquid as "milky" or "streaky" and when applied to the nostrils said to give off the odor of chloroform. This as claimed, bolstering the theory that Rosa drove Dave down to the road, and to the place where Sparks and Walden were lying in wait, and there, with the assistance of Rosa, administering chloroform to Dave, taking him to the barn and hanging him. The bottle described was apparently an ordinary liquor bottle, the witnesses not agreeing as to whether it was a pint or half-pint size. Sparks and Walden had bought a pint of whiskey from Dave the same afternoon.

We put little credence in this phase of the commonwealth's theory, for this reason: About a week after Dave's burial, his body was exhumed, we assume at the instance of the commonwealth. A doctor who had removed the stomach said: "It was empty and hard like a rock." This doctor did not make an examination of the organ; he did not detect any odor of chloroform. He turned the stomach over to the county judge or county attorney, and said that it was sent to the Kentucky University for an analytical examination, and was sure that a report had been made to and received by either the county judge or county attorney. The county judge had died in the meantime; where the county attorney was at the time is not developed. By colloquy it appears that the report had been turned over to the circuit clerk, who seems to have made a cursory examination and reported that he could not find it.

This was all brought out in defendant's testimony. The commonwealth made no effort to find, or assist in finding this report, which, had it indicated a finding of evidence of the use of chloroform, would have strengthened its case.

At 8 or 9 o'clock on the Sunday morning after the discovery of the hanging body, the county coroner was notified, and he, his brother and another person went to the scene at once. The body was taken down and removed to the Woolery home. The coroner says he did not detect the odor of chloroform.

At this point we recite some of the evidence of that officer to demonstrate two points: (1) That the character of evidence, as given, with the use of a map as illustrative, in the manner given, is of little real assistance to the court; (2) that it is not difficult for us to perceive that the tracks relied on as being strongly circumstantial may have been and perhaps were the tracks made by the officer and his companions, or by others, who, after the body was discovered, were milling around to a considerable extent.

The coroner examined the body before it was removed, and afterwards when the clothing was removed. There were no marks of violence, save that made by the chain around Woolery's neck. Asked by defendant's counsel how he went to the scene, he said:

"I went from the lower lot right up to the barn. If I had a map I could show you."

A drawing was produced and he said:

"We come and parked our car right here and walked up here, and down across this way; and through the corner here. This is the old road and this is the branch; we crossed that bridge and come right down this way; we crossed this fence right here, and out around this corner of the barn and here's where he was hanging. We crossed that fence there, and right back this way around the corner to the barn, on around and came in right here. That's how I went in the barn. There were three of us. We all went together when we went to the barn. It was terribly muddy. His shoes were muddy, but not as muddy as mine."

The description of the party's movements toward the barn, in the absence of some marking, is not en-

lightening. It does throw doubt as to whether or not the tracks mentioned by the commonwealth's witness were made by Sparks and appellant, and some third person, particularly so when we gather from the record that there was no suspicion of the appellant and Sparks until quite a while after the coroner's view. In fact, while the record is not clear, the strongest witness for the commonwealth did not make an examination for tracks and bottles until the Monday following the day when the body was found. Appellant's testimony was frank, clear and unshaken on a vigorous cross-examination.

We shall not take space nor time to discuss other details, such as the presence of mud on the inside and outside of Woolery's hands, or absence of mud on his shoes, or on his knife, or on the trace chain by which he was found hanging. As to the mud on the shoes, or the absence of it, it is shown that there was a rock ledge leading from near Woolery's home to near the entrance of the barn, which one might follow without encountering the deep mud in the barn lot, or at other places. Woolery was familiar with this situation, and with the barn, since he was employed by Garrett. He had been depressed, and had made some veiled threats.

However, it is not our part to undertake to determine whether Woolery took his own life or not. We review the evidence to determine whether or not it was sufficient to uphold the verdict or to take the case to the jury. After a careful consideration, we conclude that the commonwealth failed to make a case, and that the court should have granted the motion for a peremptory in behalf of defendant. The judgment is therefore reversed, with directions for proceedings in accord with this opinion.

Judgment reversed.